IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
No.

| | |
|---|---|
| WILSON BUNN, and the SOUTHERN STATES POLICE BENEVOLENT ASSOCIATION, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE CITY OF BREVARD, THOMAS JORDAN, individually and in his official capacity as Chief of Police of the Brevard Police Department, WILSON HOOPER, individually and in his capacity as City Manager of the City of Brevard, <br><br> *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      **COMPLAINT**<br>    **(Jury Trial Demanded)** |

Plaintiffs Wilson Bunn and the Southern States Police Benevolent Association, Inc., complaining of Defendants the City of Brevard, Chief Thomas Jordan, and City Manager Wilson Hooper, allege as follows:

## INTRODUCTION

This matter arises from Defendants' retaliatory firing of Sergeant Wilson Bunn, a police officer at the Brevard Police Department, based upon the content of his privileged communications with his legal counsel, his efforts to bring potential misconduct to the attention of the City of Brevard, and upon the actions of the Southern States Police Benevolent Association in petitioning the government for the redress of its members' grievances.

In August 2024, Sergeant Bunn, a PBA member and officer at BPD, contacted the PBA seeking legal advice about evidence, including narcotics items, missing from BPD's evidence room. Sergeant Bunn was concerned that BPD was not taking the issue seriously,

1

and sought legal advice as to his obligations to report missing evidence to the appropriate authorities. Sergeant Bunn's PBA-provided counsel contacted the City Attorney of Brevard to notify him of the concern about missing evidence.

Chief Thomas Jordan quickly became aware that Sergeant Bunn had discussed the missing evidence with his counsel. This angered him. In retaliation, Chief Jordan locked Sergeant Bunn out of BPD's systems, had him escorted from BPD's property by an armed officer, and, upon information and belief, took steps to scapegoat him for the missing evidence. Sergeant Bunn reported Chief Jordan's conduct to his counsel and the PBA.

Within hours of Sergeant Bunn's report that he had been escorted from the building and locked out of BPD's systems, the PBA sent a letter to the Brevard City Council notifying it of the missing evidence and potential retaliation against employees, including Sergeant Bunn, who had reported it. Days later, the PBA appeared at a public meeting of the Brevard City Council and asked it to take action to investigate alleged misconduct at BPD. The PBA thus twice petitioned the government of Brevard to redress Sergeant Bunn's grievances. Following this public hearing, Sergeant Bunn met with the City Manager, Wilson Hooper, and alerted him to both the missing evidence and Chief Jordan's retaliatory conduct. The next business day, Chief Jordan placed Sergeant Bunn under investigation and on administrative leave.

During the ensuing internal affairs investigation, BPD ordered Sergeant Bunn—under threat of termination—to reveal information protected by the attorney-client privilege. Under duress, he did so. It also became clear during this investigation that the true cause for Sergeant Bunn's discipline was (1) Sergeant Bunn's speech directed to the PBA and his counsel, (2) the PBA's advocacy for Sergeant Bunn, and (3) Sergeant Bunn's association with the PBA—not any alleged misconduct. Indeed, this fact was confirmed by the City's outside counsel.

Ultimately, the City terminated Sergeant Bunn based on his privileged communications with his personal counsel, his efforts to bring potential misconduct to the City's attention, his association with the PBA, and the PBA's constitutionally protected advocacy. Upon information and belief, Chief Jordan then tried to have Sergeant Bunn's occupational certification revoked by falsely accusing him of, among other things, removing a jar of marijuana from the evidence room. Reviewing the same facts available to BPD, the occupational standards panel rejected these allegations of misconduct against Sergeant Bunn.

Sergeant Bunn and the PBA now bring this action to vindicate their constitutional rights.

## PARTIES

1. Plaintiff Sergeant Wilson Bunn is a citizen and resident of the State of North Carolina. He resides in Henderson County.

2. Plaintiff the Southern States Police Benevolent Association, Inc. ("PBA") is a non-profit corporation organized and existing under the laws of the State of Georgia and registered to do business in North Carolina. It is an eleven-state police association comprised of more than 70,000 members that promotes effective law enforcement and the rights and safety of police officers. The PBA has 17,072 members in North Carolina, making it the largest voluntary association of law enforcement personnel in the State.

3. The PBA serves as the voice of the police community in North Carolina. The PBA has actively engaged in advocacy in North Carolina since the late 1980s, and has appeared before all branches of government and before courts throughout North Carolina.

4. The PBA represents officers and other public employees in legal, labor, legislative, and political matters that affect the law enforcement profession. Its legal services include emergency representation for shooting incidents, counseling regarding occupational

duties, defense representation in civil or criminal actions stemming from work-related conduct, representation in grievance and disciplinary matters, and representation in civil actions such as this.

5.    Sergeant Bunn is a member of the PBA.

6.    Defendant the City of Brevard (the "City" or "Brevard") is and at all pertinent times has been a city chartered by the State of North Carolina located in Transylvania County. The City operates and maintains a law enforcement agency known as the City of Brevard Police Department ("BPD").

7.    Defendant Thomas Jordan ("Chief Jordan") is the City of Brevard's Chief of Police. Upon information and belief, Chief Jordan resides in Transylvania County. Upon information and belief, at all times relevant to this lawsuit, Chief Jordan acted within the course and scope of his employment as Chief of Police for the City of Brevard, and his actions are imputed to the City of Brevard and BPD under the doctrine of *respondeat superior*.

8.    Defendant Wilson Hooper ("Manager Hooper") is the City Manager for the City of Brevard. Upon information and belief, Manager Hooper resides in Transylvania County. Upon information and belief, at all times relevant to this lawsuit, Manager Hooper acted within the course and scope of his employment as City Manager for the City of Brevard, and his actions are imputed to the City of Brevard under the doctrine of *respondeat superior*.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over the matters asserted herein pursuant to 28 U.S.C. §§ 1331, 1367.

10.   Venue is proper in this Court pursuant to 28 U.S. Code § 1391(b)(1).

## STATEMENT OF FACTS

### *Sergeant Bunn's*
### *Law Enforcement Background*

11.     Sergeant Bunn received a Bachelor of Science from Appalachian State University in 2006. He then earned a Certificate of Nonprofit Management from Duke University in 2009 and a Master of Arts from Liberty University in 2015. In 2018, he was hired as an Adjunct Instructor at Asheville Buncombe Technical Community College to teach Mental Illness for Basic Law Enforcement Training, Patrol Techniques, and Cultural Diversity.

12.     From 2015 to 2021, Sergeant Bunn worked as the owner and operator of Asheville Self Defense. In this role, he developed an after-school program for students in Asheville, North Carolina, interested in learning self-defense techniques. Sergeant Bunn worked with local schools and churches to aid them in developing protocols to mitigate risk in the event of an active shooter. His business grew by 300% over five years.

13.      Sergeant Bunn received his Basic Law Enforcement Training Certificate in 2012 and began his law enforcement career that year at the Asheville Police Department.

14.     Sergeant Bunn joined APD when the department was in the midst of a crisis involving its evidence room. Approximately 115 pieces of evidence were missing. APD notified the local District Attorney, Ron Moore, who ordered the evidence room sealed and notified the State Bureau of Investigation. An investigation ultimately led to the arrest and conviction of the evidence room manager, who was sentenced to federal prison. Upon information and belief, standard practice at APD from that point forward was to notify the District Attorney of any missing evidence.

15.     Beginning his law enforcement career in this environment, Sergeant Bunn became sensitive to evidence storage and security issues. Sergeant Bunn received additional

training and instruction throughout his career confirming that, if evidence was ever discovered missing from an evidence room, best practice was to notify the local District Attorney and State Bureau of Investigation.

16.     While at APD, Sergeant Bunn became a Field Training Officer and a K9 handler. His service record at APD was unblemished.

17.     In 2018, Sergeant Bunn joined the Henderson County Sheriff's Office ("HCSO") as a Deputy Sheriff. There, he served as a Major Crimes Unit Detective, Crisis Negotiations Team Leader, Homeland Security Investigations Task Force Officer, and Internet Crimes Against Children ("ICAC") Task Force member. He also became a Certified Rapid Deployment Instructor. His service record at the HSCO was unblemished.

18.     Sergeant Bunn joined BPD on November 27, 2023, as a Detective in BPD's Criminal Investigations Division. He continued to serve as a Homeland Security Investigations Task Force Officer and ICAC Task Force member.

19.     In his capacity as Detective, Sergeant Bunn was responsible for responding to crime scenes and preserving and collecting evidence. This included using proper forensic methodology for trace evidence while maintaining chain of custody and preserving perishable elements such as DNA, blood, semen, and fingerprints.

20.     At BPD, Sergeant Bunn was also assigned to serve as the Department's Accreditation Manager. In this role, he was responsible for working with BPD administrators to write, modify, and update policies, practices, and procedures in accordance with the best practices identified by the North Carolina Law Enforcement Accreditation program.

21.     Over the course of his career, Sergeant Bunn has accumulated more than 1,369 hours of tactical and patrol training, 900 hours of investigations training, 440 hours of crisis negotiations training, and 858 hours of law enforcement teaching experience. He has also

procured 13 distinct law enforcement certifications, ranging from Crisis Negotiator to General Instructor.

22.     At no time in his law enforcement career had Sergeant Bunn been reprimanded, disciplined, or placed under investigation.

### BPD's Mismanaged Evidence Room

23.     When Sergeant Bunn joined BPD in November 2023, its evidence room was in disarray. Upon information and belief, the evidence room had not been audited since 1996.

24.     On February 19, 2024, Catherine Cook, the evidence room technician at BPD, resigned due to "the ongoing toxic work environment." (Ex. 1).

25.     Sergeant Bunn and BPD Detective Adam Moore volunteered to assume management over the evidence room. Chief Jordan agreed.

26.     Sergeant Bunn and Adam Moore quickly realized that the evidence room at BPD was disorganized.

27.     Evidence was not stored correctly, and the system for managing that material was antiquated and inadequate. The evidence room needed to be inventoried and reorganized.

28.     Sergeant Bunn first familiarized himself with evidence and property storage best practices, and then began to inventory all evidence in BPD's evidence storage room and update the evidence storage system.

29.     Sergeant Bunn secured federal funding to obtain new equipment to reorganize and inventory the evidence room.

30.     The new organizational system devised by Sergeant Bunn complied with current standards of care applicable to the storage of evidence.

31.     As part of his organizational process, Sergeant Bunn printed a barcode for each piece of evidence and updated its location in BPD's Records Management System ("RMS").

7

32.     While inventorying evidence, Sergeant Bunn discovered inconsistencies. For example, after barcoding all evidence in a specific drawer, Sergeant Bunn discovered that, although he had re-inventoried every item in that location, BPD's RMS indicated that additional items should be present. In other words, it appeared that evidence was missing.

33.     Initially, this did not concern Sergeant Bunn. In some instances, "missing" evidence might be found later elsewhere in the evidence room. Sergeant Bunn would then re-inventory such evidence and place it in the correct location.

34.     At no time did Sergeant Bunn take or otherwise remove evidence from BPD's evidence room.

35.     On April 1, 2024, Sergeant Bunn was promoted to Sergeant. Although his new responsibilities were primarily focused on patrol, Sergeant Bunn would come in on his off days to assist in the evidence room.

36.     In or around June 2024, BPD hired Eden Hinds as an evidence specialist. By the time of this hiring, Sergeant Bunn and Mr. Moore had reorganized and catalogued approximately half of the evidence in BPD's property room.

37.     Working together, Ms. Hinds, Sergeant Bunn, and Mr. Moore completed the inventory of BPD's evidence room on or about June 18, 2024.

38.     On or about that date, Ms. Hinds informed Sergeant Bunn that RMS indicated several pieces of evidence were missing. In total, approximately 253 items were potentially missing, including 27 items of narcotics.

39.     Sergeant Bunn reasonably advised Ms. Hinds that, based on his knowledge of the prior missing evidence situation at APD, it may be necessary for BPD to notify the local District Attorney or the State Bureau of Investigation—especially if evidence in an active prosecution were missing—and that, in any event, no evidence should be disposed of until the local District Attorney was notified.

40.     In text message communications, Ms. Hinds characterized this as a "beautiful" idea, and told Sergeant Bunn that she wanted to send a letter to the local District Attorney "with a status of what is coming."

41.     Sergeant Bunn never suggested to Ms. Hinds that they should go behind Chief Jordan's back to report missing evidence to outside authorities.

42.     On the contrary, Sergeant Bunn indicated that Chief Jordan should be informed of the missing evidence.

43.     On or around June 26, 2024, Ms. Hinds informed Chief Jordan that evidence was missing.

44.     Upon information and belief, she specifically informed Chief Jordan that there were 90 evidentiary discrepancies. Upon information and belief, Ms. Hinds kept Chief Jordan apprised of developments in the evidence room, including missing evidence, by attending weekly meetings with Chief Jordan beginning on or about July 7, 2024.

45.     Sergeant Bunn never instructed Ms. Hinds to stop communicating with Chief Jordan about the evidence room.

46.     Chief Jordan did not express urgency in addressing the missing evidence.

47.     Chief Jordan did not seal the evidence room, notify the local District Attorney, or inform the State Bureau of Investigation.

### Sergeant Bunn Seeks Legal Counsel Concerning
### His Obligations With Respect to the Missing Evidence

48.     For years, the PBA has worked to bring problematic and potentially unlawful conduct at BPD to the attention of the Brevard City Council, and to seek redress for its members' grievances.

49.     Prior to Sergeant Bunn joining BPD in 2023, Steve Anthony, a staff representative with the PBA, told the Brevard City Council that "some internal affairs and

employment practices [at BPD] have likely violated the US and State Constitutions, City policies, and accepted practices. [W]e feel some officials of the City have possibly violated N.C. Gen. Stat. § 14-230[, and] we request [the] City Council to use its . . . authority . . . to hold investigations and hearings into the conduct of certain city officials." (Ex. 2).

50.     Mr. Anthony also told the City Council that "most PBA members at the Brevard Police Department are unhappy with how the City has been treating them." (Id.).

51.     Thus, to assist and advise several of its members in connection with their disputes at BPD, the PBA retained Douglas Pearson. Mr. Pearson is an attorney licensed to practice law in North Carolina

52.     In early August 2024, Sergeant Bunn contacted Mr. Pearson.

53.     Sergeant Bunn knew Mr. Pearson was a PBA-retained attorney who had assisted BPD personnel previously. He contacted Mr. Pearson to seek legal advice.

54.     Sergeant Bunn intended to form an attorney-client relationship with Mr. Pearson and the PBA. Sergeant Bunn's communication with Mr. Pearson was made in confidence, and was made in reference to the matter for which Mr. Pearson was being consulted. Sergeant Bunn's communications with Mr. Pearson were not made pursuant to his official duties as a BPD officer.

55.     Mr. Pearson obtained permission from the PBA to represent Sergeant Bunn. The PBA has a goal of protecting and promoting the livelihood of its members. Its decision to authorize Mr. Pearson's representation of Sergeant Bunn advanced this purpose.

56.     Sergeant Bunn contacted Mr. Pearson because he was concerned about evidence missing from BPD's evidence room and the lack of urgency from Chief Jordan in addressing the issue. Aware of what had happened at APD earlier in his career, Sergeant Bunn contacted Mr. Pearson for advice about his potential legal obligations to report missing evidence to the appropriate authorities.

57.     During his conversations with Mr. Pearson and the PBA, Sergeant Bunn did not accuse BPD or anyone at BPD of illegal or corrupt activity, or of mismanagement.

58.     Shortly after he spoke with Sergeant Bunn, Mr. Pearson contacted Mack McKeller, the City Attorney for the City of Brevard ("City Attorney McKeller") to, upon information and belief, discuss multiple ongoing issues. Mr. Pearson and City Attorney McKeller had already been in regular and frequent communication concerning the complaints and grievances of several officers employed by BPD.

59.     During their conversation, Mr. Pearson mentioned to City Attorney McKeller that evidence was missing from BPD's evidence room.

60.     Mr. Pearson later explained to City Attorney McKeller that it was Sergeant Bunn who had brought the missing evidence to his attention. Mr. Pearson also informed City Attorney McKeller that the PBA would be willing to assist, or provide resources to assist, with the missing evidence. City Attorney McKeller indicated he would check on the missing evidence.

61.     By September 6, 2024, having received no response from City Attorney McKeller, Mr. Pearson and the PBA became concerned with the lack of urgency from BPD and the City. They worried that BPD might be attempting to conceal the fact that evidence was missing from its evidence room.

62.     As demonstrated by Mr. Anthony's comments in 2023, and as later explained by Brandon McGaha, a PBA Staff Representative, and Rick Tullis, the Mountain Chapter President of the PBA, there were BPD employees other than Sergeant Bunn who had made "disturbing complaints . . . about the administration of [BPD]." (Ex. 3).

63.     In one example, Mr. Tullis explained that Chief Jordan "acted in a manner that appears to be retaliatory . . . [by] abruptly changing the patrol schedule to a schedule to [an] untenable [one] . . . immediately following an OSHA investigation that was brought forth

by the concerns by the concerns of members of that agency." (Id.). As Mr. McGaha explained, these individuals and others "have concerns for retaliation," but were willing to sit down with the City Council or Manager Hooper to discuss their grievances. (Id.).

64.     Thus, on September 10, 2024, Mr. McGaha sent correspondence to Mayor Maureen Copelof stating, "We have police employees who want to report corrupt and possibly unlawful activity." Sergeant Bunn was not one of the police employees referenced in this correspondence.

65.     By this time, the City of Brevard, Chief Jordan, and, upon information and belief, Manager Hooper were all aware that Sergeant Bunn had expressed concerns about the evidence room to the PBA. Upon information and belief, however, Defendants erroneously concluded that Sergeant Bunn was among the "police employees" referenced in Mr. McGaha's correspondence.

### Chief Jordan's Apparent Intent to Scapegoat Sergeant Bunn for BPD's Missing Evidence

66.     Later on September 10, 2024, Ms. Hinds sent a document to Chief Jordan indicating that 27 pieces of evidence, including narcotics items, were missing from BPD's evidence room.

67.     On September 11, and in response to Ms. Hinds's email, Chief Jordan ordered her to "remove access to this document for [Sergeant Bunn] and [Adam Moore] for the time being. Do not notify them. If removing access will result in some sort of notification, contact me." (Ex. 4).

68.     Immediately thereafter, Chief Jordan sent Ms. Hinds a text message on her personal phone directing her to "limit your conversations with [Sergeant Bunn] and [Adam Moore]. I will explain more tomorrow sometime." (Ex.5).

69. Ms. Hinds was surprised by this message and asked where she should go if she had questions about evidence paperwork. Chief Jordan replied, "I can explain tomorrow but . . . [b]e guarded with [Sergeant Bunn] and [Adam Moore]. There is possibly more in play here. The game is afoot. Just double check the narcotics." (Ex. 6).

70. Later that afternoon, Ms. Hinds and Sergeant Bunn spoke on the phone. During this conversation, Ms. Hinds advised Sergeant Bunn that she believed Chief Jordan was trying to cover up the missing evidence by blaming its loss on Sergeant Bunn.

71. Upon information and belief, Chief Jordan was, in fact, taking steps to scapegoat Sergeant Bunn for the missing evidence.

### Chief Jordan Locks Sergeant Bunn
### Out of BPD's Systems and Sends Him Home

72. Sergeant Bunn returned to BPD on September 13, 2024. Upon his arrival, he found that his access to the RMS had been restricted and that his permissions to access certain files had been revoked. Sergeant Bunn required these permissions and access to the RMS to perform his job duties.

73. Upon information and belief, Chief Jordan had ordered Sergeant Bunn to be locked out of BPD's systems.

74. In light of his conversations with Ms. Hinds, and his knowledge of the history of perceived retaliation at BPD, Sergeant Bunn feared that he was being retaliated against for speaking with Mr. Pearson and the PBA.

75. Thinking he was about to be wrongly terminated, Sergeant Bunn moved a selection of files stored on his BPD OneDrive to an external hard drive that was plugged into his work computer.

76. Sergeant Bunn took no intentional steps to delete any of these files, which remain in existence and accessible by BPD to this day.

77.     The files Sergeant Bunn moved mostly consisted of personal files, such as his resume, photographs of himself and his team, educational materials from conferences he attended, letters of good standing, and other publicly available materials.

78.     None of the documents Sergeant Bunn moved were confidential, and none were BPD's "record copy." Pursuant to the City of Brevard's Records Retention Schedule, a "record copy" is the "'[t]he single copy of a document, often the original, that is designated as the official copy for reference and preservation.' The record copy is the one whose retention and disposition is mandated by these schedules[.]"

79.     Upon information and belief, on September 13, 2024, the City still had access to all of the materials moved by Sergeant Bunn—including the "record copy" of those materials—because those materials were located elsewhere on the City's servers and/or on other computers.

80.     Moving files from a BPD OneDrive to an external hard drive is a common practice at BPD. In fact, upon information and belief, BPD purchased and issued external hard drives to officers for this very purpose.

81.     Later during the morning of September 13, 2024, Sergeant Bunn received correspondence from Chief Jordan indicating that he was being removed as BPD's Accreditation Manager. Chief Jordan ordered Sergeant Bunn to forward "all contacts and other documents" associated with his role as Accreditation Manager to Ms. Hines.

82.     As he was forwarding the requested materials to Ms. Hines, Sergeant Bunn was approached by an officer, who, upon information and belief, at the direction of Chief Jordan, ordered Sergeant Bunn to leave BPD for the day. Sergeant Bunn was escorted out of the building and driven home by an armed officer, who did so, upon information and belief, at the direction of Chief Jordan.

83.     Sergeant Bunn left his external hard drive plugged into his computer at BPD.

84.     After he was escorted from BPD on September 13, 2024, Sergeant Bunn notified Mr. Pearson and the PBA of Chief Jordan's actions.

85.     On the evening of September 13, 2024, Mr. Tullis  sent a letter to Mayor Copelof and the Brevard City Council stating that BPD's evidence room was missing evidence, and that officers who had come forward with information about misconduct at BPD are being "targeted for retaliation by the administration of the police department." (Ex. 7).

86.     The PBA sent this letter to the City Council to petition the City of Brevard to provide redress for the grievances of PBA members, including Sergeant Bunn, employed by the City.

87.     The PBA sent this letter to petition the government for the redress of its members' grievances.

88.     That evening, a local news station, WLOS, reported on Mr. Tullis's letter.[1]

89.     Chief Jordan initially gave a quote to WLOS falsely stating that "no one within the department has raised concerns to [me] or reported that evidence is missing."  This quote was later amended to, "no officers within the department have raised concerns to [me] or reported that evidence <u>in their cases</u> is missing." In either case, however, Chief Jordan's statement to WLOS heightened Sergeant Bunn's and the PBA's concern that BPD was trying to either scapegoat Sergeant Bunn or hide the fact that BPD had misplaced evidence.

90.     In a text message, Ms. Hinds told Sergeant Bunn that she was "so upset" and "hurt" by Chief Jordan's statements to WLOS, which she characterized as "so untrue."

---

[1] Jennifer Emert, "Local Police Association Alleges Missing Evidence, Retaliation at Brevard PD," WLOS, Sept. 13, 2024, https://wlos.com/news/local/local-police-association-alleges-missing-evidence-retaliation-brevard-police-department-whistleblowers-mountain-chapter-north-carolina-police-benevolent-association.

91.    On September 16, 2024, the City Council held a meeting. During the public comment period, Mr. McGaha and Mr. Tullis spoke about the widespread dissatisfaction of BPD officers with their working conditions. Mr. Tullis added,

> [The PBA has] been made aware that there are several items of evidence missing, including money and drug evidence . . . . [T]he Chief went on the record recently with the media to say that he was never made aware of the state of the evidence room. We have documents in our possession that are public record that contradict his statements. Not only was he aware, instead of working with his staff to resolve this issues, we have documents to show he acted in a manner to subvert and block the efforts of his staff.

(Ex. 3).

92.    Mr. Tullis and Mr. McGaha made statements during the September 16, 2024, City Council meeting not only for the purpose of advocating for Sergeant Bunn and other PBA members employed by BPD, but also for the purpose of petitioning the City Council to provide redress for PBA members' grievances.

93.    To this end, Mr. McGaha asked the City Council to "hold hearings and hear officers as to the functionality of the PD . . .[,] make sure the city services are topnotch[, and ensure its] workplace [is one] where employees feel vested and part of the mission of the city." (Id.). Mr. Tullis further "urgently ask[ed] [the] council, as within its authority per NCGS 160A-80, to initiate an investigation, subpoena any records relating to the obstruction of officers' abilities to uphold their oaths of officers, retaliatory actions that have created a hostile work environment for the officers, and refusal to report as required to the District Attorney the department's compromised ability to provide evidence in criminal cases." (Id.).

94.    Mr. Tullis and Mr. McGaha spoke at the Brevard City Council meeting to petition the government for the redress of its members' grievances.

### Sergeant Bunn Reports Chief Jordan's
### Conduct to the City of Brevard

95.     Days earlier, on September 11, 2024, City Attorney McKeller had instructed the PBA to "work through [Mr. Pearson] to have [allegations of misconduct] brought to the attention of the City . . . to ensure protection [for those officers seeking protection."] (Ex. 8).

96.     Thus, after consulting with Sergeant Bunn, Mr. Pearson attempted to schedule a meeting between City Attorney McKeller, Manager Hooper, and Sergeant Bunn so that Sergeant Bunn could raise his concerns about Chief Jordan's conduct in a setting they believed was protected. Manager Hooper met with Sergeant Bunn on September 20, 2024, regarding Sergeant Bunn's complaint about being escorted out of the building and driven home on September 13, 2024.

97.     Sergeant Bunn did not escalate his concerns about Chief Jordan through his chain of command because Chief Jordan—the person retaliating against him—was _in_ his chain of command. Any attempt to escalate his concerns through this chain therefore would have been futile and would have, upon information and belief, prompted additional retaliation.

98.     During the September 20, 2024 meeting, Sergeant Bunn relayed his concerns about the evidence room, made the City aware of Chief Jordan's alarming emails and text messages to Ms. Hinds, and informed the City that Ms. Hinds had told him that she believed Chief Jordan intended to blame him for missing evidence.

99.     Sergeant Bunn explained that Chief Jordan had locked him out of BPD's systems, removed him as Accreditation Manager, and ordered an armed law enforcement officer to escort him from the premises for no apparent reason. Sergeant Bunn stated that he believed was being retaliated against.

100. Sergeant Bunn's statements during the September 20, 2024 meeting were not made pursuant to his official duties as a BPD police officer and pertained to matters of public concern: whistleblower retaliation and missing evidence.

***BPD Commences a Pretextual***<br>***Investigation into Sergeant Bunn***

101. On September 23, 2024, the <u>next business day</u> following his meeting with City Attorney McKeller and Manager Hooper, Sergeant Bunn received a letter from Chief Jordan placing him on "non-disciplinary / paid / administrative leave" in light of an investigation into him regarding:

> violations of City of Brevard Policy including, but not limited to, discourteous treatment of other employees, failure to comply with the City of Brevard Computer Usage Policy, and willful destruction of City property. The Brevard Police Department is also investigating allegations that you violated Brevard Police Rules of Conduct, including, but not limited to, honesty, conformance to law and policy, compliance with orders, abuse of authority, abuse of process, conduct unbecoming, and neglect of duty/unsatisfactory performance.

(Ex. 9).

102. Sergeant Bunn did not commit any of the alleged misconduct identified in the letter.

103. Although the City of Brevard's personnel policy requires, for any employee being placed on "administrative leave," the employee to be informed "what the accusations or allegations are that triggered the leave and why an administrative leave had been imposed in a particular case," Sergeant Bunn was not informed of the specific allegations against him.

104. Upon information and belief, Sergeant Bunn was placed on administrative leave based on not only his communications with Manager Hooper and City Attorney McKeller the previous business day, but also his communications with his counsel in August and the PBA's statements to the Mayor and the City Council.

105.     After Sergeant Bunn received this letter, Mr. Pearson sent correspondence to City Attorney McKeller stating that the City had "failed to recognize the legitimate 'whistleblower retaliation' claims made by my client . . . . The City has now appeared to double down on its retaliatory efforts." In response to this email, City Attorney McKeller stated,

> your client failed on Friday to bring any allegations of criminal or unethical activity by anyone at the City of Brevard therefore I do not see how any 'whistleblower retaliation' allegations would apply to this situation.  Even if he had brought forth such information, as you also know, the North Carolina Whistleblower Act does not apply to municipalities at this time.

106.     Mr. McKeller's statement that Sergeant Bunn had failed to "bring allegations of criminal or unethical activity by anyone at the City of Brevard" is false. Just the prior business day, Sergeant Bunn informed Manager Hooper and City Attorney McKeller that Chief Jordan was attempting to blame him for missing evidence.

### *Under Threat of Termination, Sergeant Bunn Is Ordered to Reveal Information Protected By the Attorney-Client Privilege*

107.     On or about October 22, 2024, the City of Brevard contracted with Richardson Davis & Forest Investigative Group, LLC ("R&D") to conduct an "internal investigation of alleged actions . . . by Sgt. Wilson Bunn[.]" (Ex. 10).

108.     On November 7, 2024, Sergeant Bunn sat for an interview with R&D. The primary investigator was David Drew (N.C. License No. 483928).

109.     Although BPD policy required Sergeant Bunn to be informed of the specific allegations against him when he was placed on administrative leave, he had never been so informed. Furthermore, Sergeant Bunn's access to his BPD email had been removed on September 23, 2024, rendering him unable to review specific communications and dates to prepare for his interview with R&D. Sergeant Bunn had also never been given a list of files he purportedly "deleted." R&D, however, had access to all such information.

110. At the beginning of the interview, the investigators read Sergeant Bunn his rights under <u>Garrity v. State of N.J.</u>, 385 U.S. 493, 500 (1967), and ordered him to answer each question they asked him under threat of "any level of discipline, up to and including dismissal." They also told him that the "penalty for refusing to answer questions may be dismissal." (Ex. 11).

111. It became clear during Sergeant Bunn's interview that the true cause for his investigation was his communications with the PBA. Mr. Drew explained that "the PBA contacted [Attorney McKeller and Manager Hooper] in August about [the missing evidence]." Mr. Drew indicated that Manager Hooper then met with Chief Jordan to discuss this issue.

112. Mr. Drew asked Sergeant Bunn "how in the world" the PBA found out about the missing evidence, and explained that Chief Jordan was "spooled up" that the PBA was "calling his boss."

113. Mr. Drew explained that the PBA's communications with Manager Hooper in August caused Chief Jordan to remove Sergeant Bunn's access to BPD's systems. He said, "I don't think the Chief woke up on September 10 and decided, you know what, I'm just going to cut this guy out." Mr. Drew explained that the "issue" started in August when Mr. Pearson informed Manager Hooper that there was a "problem" in the evidence room.

114. Mr. Drew confirmed that Sergeant Bunn was escorted off BPD's premises by an armed officer because the PBA had contacted Manager Hooper. Sergeant Bunn responded, "[T]he department has been talking with the PBA for a year and a half and no one has been escorted out of the building without explanation." Mr. Drew then stated, "Yeah, but for a year and a half I don't think [the PBA] call[s] over [to the City Manager] every time someone says something."

115. The investigators explained that BPD believed that, based on the PBA's public statements, Sergeant Bunn had made false statements to the PBA. The investigators also

said that the "real problem here" was that Sergeant Bunn "went to the police rep" to arrange a meeting with the Manager Hooper rather than discussing his concerns inside his chain of command with BPD—even though Sergeant Bunn's chain of command included the very person retaliating against him.

116.    The investigators also falsely insinuated that Sergeant Bunn was "trying to orchestrate [the Chief's termination] by making accusations to the PBA about the evidence room."

117.    The investigators pressed Sergeant Bunn to reveal his communications with Mr. Pearson and the PBA. They asked, "How does the PBA know that there is a problem in the evidence room so that they talk to the City Manager and City Attorney about it?" Sergeant Bunn responded, "I see the PBA as my legal representative. I see my communications with them as privileged confidential information."

118.    Sergeant Bunn's communications with the PBA and Mr. Pearson are privileged. Raymond v. N. Carolina Police Benevolent Ass'n., Inc., 365 N.C. 94, 101, 721 S.E.2d 923, 928 (2011) ("In sum, we hold that a tripartite attorney-client relationship exists between the SSPBA, Lovins, and Foxx, such that communications between them which satisfy the five-factor Murvin test are privileged.").

119.    Under threat of termination, however, Sergeant Bunn conceded he had informed his legal counsel that evidence was missing from the evidence room, and that he had concerns about Chief Jordan's lack of urgency in addressing that missing evidence.

120.    Despite Sergeant Bunn informing the investigators that his communications with Mr. Pearson and the PBA were privileged, they continued to badger Sergeant Bunn about the substance of his conversations with his counsel and the PBA.

121.    Sergeant Bunn explained that he had contacted his counsel on September 13, 2024, because he feared Chief Jordan intended to scapegoat him for missing evidence.

Sergeant Bunn truthfully explained that this was the first and only time he informed his counsel that anything potentially unlawful was occurring at BPD.

### BPD Proposes Terminating Sergeant Bunn
### Based on his Association and Privileged Communications With the PBA

122. On December 16, 2024, Sergeant Bunn received a letter (the "Pre-Disciplinary Letter") notifying him that he was scheduled for a pre-disciplinary conference on December 17, 2024, with Chief Jordan and Kelley Craig, the human resources director. (Ex. 12).

123. The Pre-Disciplinary Letter notified Sergeant Bunn that R&D had sustained the following allegations against him:

- Sergeant Bunn "willful[ly] destro[yed] City property . . . by deleting records . . . from the . . . OneDrive account assigned to [him]";
- Sergeant Bunn engaged in "dishonesty" by denying that he had deleted these records; and
- Sergeant Bunn engaged in "abuse of process" when he reported "flawed, incomplete, and false information" to the PBA without addressing those concerns with his chain of command.

124. None of the allegations in the pre-disciplinary letter are true.

125. The Pre-Disciplinary Letter asserted that Sergeant Bunn "violated the City of Brevard Computer Usage Policy" by purportedly "deleting records" from his OneDrive.

126. The City had no such "Computer Usage Policy."

127. The City of Brevard instead had a "Computer and Electronic Communication Policy," which does not prohibit transferring records from OneDrive to an external hard drive. (Ex. 13). Furthermore, the "Computer and Electronic Communication Policy" directs City employees to preserve only "messages that are subject to the Public Records Law." (Id.).

128. There was no City policy prohibiting the transfer of files from a OneDrive to an external hard drive.

129. During his pre-disciplinary hearing, Sergeant Bunn explained to Chief Jordan and Ms. Craig, as he had previously explained to R&D, that he had not taken any intentional

steps to delete files from his OneDrive account, but instead had intended to move the files from OneDrive an external hard drive, as permitted under BPD's "Computer and Electronic Communication Policy."

130. The City possesses today—and possessed on September 13, 2024—each and every record it alleges Sergeant Bunn "destroyed." The allegation that Sergeant Bunn had destroyed records was both false and pretextual.

131. Further, during his pre-disciplinary hearing, Chief Jordan and Ms. Craig confirmed that Sergeant Bunn was actually being terminated both because he contacted the PBA, and the content of his privileged communications with the PBA.

132. On December 18, 2024, Sergeant Bunn's counsel telephoned the City of Brevard's outside counsel (the "Outside Counsel") and explained to her that, based on the interview conducted by R&D, BPD's pre-disciplinary letter, and the pre-disciplinary conference, it appeared the City was about to terminate Sergeant Bunn based on the content of his speech and his privileged communications with the PBA.

133. The Outside Counsel responded by asking how Sergeant Bunn could <u>not</u> expect to be terminated based on what he purportedly said about Chief Jordan.

134. She contended that Mr. Pearson was going around saying Brevard "needs to fire the Chief," and that the PBA was "spreading false information about the evidence room." She also said that the PBA purportedly went to the media and "got the paper reporting on the evidence room." She also cited Sergeant Bunn's purported "deletion" of files. All of this, she explained, justified Sergeant Bunn's termination.

135. When Sergeant Bunn's counsel explained to the Outside Counsel that Sergeant Bunn had taken no intentional steps to delete files, but instead had merely moved files to an external hard drive, she responded that perhaps if BPD had known this fact from the

beginning, things would have been different. Contrary to the Outside Counsel's statement, however, Sergeant Bunn had repeatedly informed BPD and R&D of these facts.

136.    Sergeant Bunn's counsel expressed concern that the City seemed poised to terminate Sergeant Bunn based on the exercise of his First Amendment rights and his privileged communications. The Outside Counsel responded that if Sergeant Bunn had a problem with being terminated based on the content of his speech, the City would simply amend the allegation in the third bullet of its pre-disciplinary letter to cite a different grounds for termination, such as insubordination. Put differently, she indicated the City would create a pretextual reason for Sergeant Bunn's termination.

### *BPD Dismisses Sergeant Bunn*

137.    On December 20, 2024, Sergeant Bunn received a dismissal letter (the "Dismissal Letter") from Chief Jordan. The letter retained the first two bullet points from the pre-disciplinary letter, but replaced the third bullet point with:

- [You violated] the Brevard Police Department Rules of Conduct regarding honesty. Over the course of the entire investigation, there have been contradictory statements made by you that show a pattern of dishonesty which are unacceptable and would prevent you from maintaining your position as a sworn police officer with the City of Brevard.

138.    Metadata associated with the dismissal letter demonstrate that it had been edited by the Outside Counsel—after Sergeant Bunn's lawyer's December 18, 2024 call with the Outside Counsel.

139.    The dismissal letter was the first instance of anyone at BPD accusing Sergeant Bunn of making "contradictory statements" that purportedly showed a "pattern of dishonesty." Because this allegation was absent from his pre-disciplinary conference letter, Sergeant Bunn had no opportunity to respond to this allegation during his meeting with Chief Jordan and Ms. Craig.

***Manager Hooper Affirms Sergeant Bunn's Dismissal***
***Based on the Content of his Privileged Communications***
***With the PBA and the PBA's Advocacy Efforts***

140.    On or about January 2, 2025, Sergeant Bunn submitted an appeal of his termination to Manager Hooper. Sergeant Bunn explained that (1) he never intentionally deleted documents, (2) BPD issued external hard drives so that employees may move files from OneDrive to those hard drives, (3) the Brevard Personnel Policy does not prohibit the transfer of records from OneDrive to a hard drive, (4) no BPD employee had ever been instructed not to transfer files from OneDrive to a hard drive, and (5) he had no opportunity to respond to the allegation that he made "contradictory statements" and that, in any event, he was never dishonest. (Ex. 14). Sergeant Bunn's statements in Ex. 14 are true.

141.    On January 16, 2024, Manager Hooper responded to Sergeant Bunn's appeal and affirmed his dismissal. (Ex. 15). Manager Hooper's letter confirms that the content of Sergeant Bunn's speech with the PBA, and the PBA's advocacy for Sergeant Bunn, proximately caused Sergeant Bunn's termination.

142.    The other reasons cited by Manager Hooper purportedly justifying Sergeant Bunn's termination were, as suggested by the Outside Counsel, pretextual.

143.    Upon information and belief, no employee in the history of BPD—or the City of Brevard generally—has ever been terminated for moving files from a OneDrive to an external hard drive.

144.    Indeed, Manager Hooper acknowledged that copying documents to an external hard drive was "not a terminable offense on its own," but that it instead requires "extenuating circumstances" to be terminable.

145.    As one purported "extenuating circumstance," Manager Hooper cited his belief that Sergeant Bunn had intended to restrict others' access to the moved records contrary to

an "expectation" that BPD employees keep electronic files "readily accessible for use by appropriate colleagues and superiors at all times."

146.    This purported expectation, however, appears nowhere in the BPD policy manual. It was also never communicated to Sergeant Bunn.

147.    Sergeant Bunn never intended to restrict others' access to the moved records, which were not "record copies" and therefore, upon information and belief, also existed elsewhere on BPD's servers.

148.    As another "extenuating circumstance," Manager Hooper falsely accused Sergeant Bunn of making "contradictory statements" during the investigation. First, Manager Hooper asserted that Sergeant Bunn had told R&D that he "didn't tell [Ms. Hinds] that she might need legal protection," but that he had texted Ms. Hinds in September that she should "[i]nform your attorney and prepare."

149.    Manager Hooper's allegations are false. As Sergeant Bunn actually explained to investigators with R&D during a <u>recorded interview</u>, Ms. Hinds was worried about her personal liability for failure to report the missing evidence, and Sergeant Bunn therefore asked Ms. Hinds whether she wanted to talk to the PBA because "they can provide us [with] legal protection or at least give us advice on what to do." Sergeant Bunn's text message to Ms. Hinds to "inform her attorney and prepare" is consistent with Sergeant Bunn's actual statement to R&D. Moreover, Manager Hooper ignores that Sergeant Bunn himself had voluntarily made his text messages with Ms. Hinds available to BPD for inspection. Sergeant Bunn had nothing to hide.

150.    As a third "extenuating circumstance," Manager Hooper falsely accused Sergeant Bunn of dishonesty because he purportedly said during his interview that he "didn't think [he had] made comments critical of Jordan to Hannah Owen," but that "Owen claimed in her interview that she overhead such comments." The two cited statements are not

contradictory. As stated by Manager Hooper, Ms. Owen contended in her interview that she merely "overheard" Sergeant Bunn making critical comments about Chief Jordan—not that Sergeant Bunn had made such statements directly to her. Moreover, Sergeant Bunn admitted during his interview with R&D that he may have made statements critical of Chief Jordan to Ms. Owen.

151.    As a fourth alleged "extenuating circumstance," Manager Hooper indicated that "there is no greater public interest than maintaining a workplace where superiors are not deliberately undermined by their employees, particularly where compliance with lawful orders can sometimes be the difference between life and death." (Ex. 15).

152.    Sergeant Bunn, however, never disobeyed or countermanded orders, or undermined Chief Jordan. To wit, neither the Pre-Disciplinary Conference Letter nor the Dismissal Letter accused Sergeant Bunn of disobeying or countermanding orders, or of undermining Chief Jordan.

153.    In a final pretextual justification, Manager Hooper indicated that BPD could no longer employ Sergeant Bunn because "[c]ontinuing to employ a police officer with credibility issues can be problematic for law enforcement agencies and prosecutors, since failure to follow the disclosure rules of Giglio endangers the integrity of the criminal justice system and also violates the ethical and Constitutional duties of a District Attorney." Sergeant Bunn does not, however, possess "credibility issues," and is not Giglio-impaired. See, e.g., Wetherington v. N.C. Dep't of Crime Control & Pub. Safety, 231 N.C. App. 503, 512, 752 S.E.2d 511, 516 (2013), aff'd as modified sub nom. Wetherington v. N. Carolina Dep't of Pub. Safety, 368 N.C. 583, 780 S.E.2d 543 (2015).

154.    Manager Hooper's remaining findings confirm that Sergeant Bunn's termination was based not only on the fact that he communicated with the PBA, but also on the content of his communications with the PBA and the PBA's advocacy on his behalf.

155. Indeed, Manager Hooper explained that the most "significant and concerning example is this: evidence strongly suggests that [Sergeant Bunn] mischaracterized to the PBA and colleagues lawful actions by the Chief of Police . . . to suggest unlawful corruption in the evidence room[.]" (Ex. 15). Citing the alleged content of Sergeant Bunn's speech, Manager Hooper falsely stated that Sergeant Bunn, in his privileged communications with the PBA, used these "mischaracterized" actions to "impugn the chief, and discredit the department." Id.

156. Upon information and belief, the "evidence" referred to by Manager Hooper included the PBA's constitutionally protected statements to the Mayor and City Council.

157. Moreover, Manager Hooper's accusation that Sergeant Bunn's "mischaracterized" Chief Jordan's actions ignores that Ms. Hinds told Sergeant Bunn she believed Chief Jordan intended to blame him for missing evidence—an act that, had it been taken, would have been both unlawful and corrupt.

158. Manager Hooper's accusation that Sergeant Bunn "mischaracterized" anything to the PBA is false.

159. Manager Hooper further added that Sergeant Bunn's privileged communications with the PBA were "malicious in nature and designed to discredit [BPD]." This accusation is false.

160. Sergeant Bunn's privileged communications with the PBA were not malicious. Indeed, Manager Hooper himself conceded that "[Sergeant Bunn's] perception that [he] [was] going to be blamed for missing evidence explains some of [his] behavior[.]" (Id.). Further, Sergeant Bunn's statements to the PBA were both privileged and constitutionally protected.

161. Manager Hooper also cited Sergeant Bunn's alleged—and privileged—statements made to his personal counsel in August 2024 as evidence that he had been dishonest with BPD: "why . . . did you suggest to the PBA in August that there was

mismanagement in the evidence room if you believed the audit was the right way forward?" (Id.). Sergeant Bunn did not accuse BPD of mismanaging its evidence room.

### *Criminal Justice Education & Training Standards' Investigation Confirms the Reasons for Sergeant Bunn's Termination And Reveals Chief Jordan's Continued Pretextual Retaliation*

162. Due to Sergeant Bunn's termination, his certification was placed under review by the Criminal Justice Education & Training Standards division of the North Carolina Department of Justice ("CJ Standards").

163. As part of CJ Standards' review of Sergeant Bunn's termination, an investigator employed by NCDOJ, Derek Dike, interviewed personnel at BPD and Sergeant Bunn.

164. Mr. Dike first interviewed Sergeant Bunn, who shared all the relevant information and documents he possessed. Mr. Dike then spoke with personnel at BPD, including, upon information and belief, Chief Jordan, before conducting a follow-up interview with Sergeant Bunn.

165. During this follow-up interview, Mr. Dike made statements confirming that BPD terminated Sergeant Bunn based on his speech, the PBA's speech, as well as Sergeant Bunn's association with the PBA.

166. On a recorded call, Mr. Dike explained that Sergeant Bunn was terminated because, after he was informed by Ms. Hinds that Chief Jordan intended to blame him for missing evidence, he "contact[ed] [the PBA], who then contact[ed] the paper, and contact[ed] the City Attorney, and contact[ed] the City Council on a smear campaign."

167. Mr. Dike later elaborated that Sergeant Bunn's decision to "report[] internal issues to the PBA, which resulted in . . . letters to the Mayor and City Council[,] [violated] Police Department policy governing rules and code of conduct." Mr. Dike also indicated that these facts are "corroborated by letters from the PBA" to the City of Brevard.

168.    Stated differently, Sergeant Bunn was terminated because he spoke with his counsel and the PBA about an issue of public concern, which prompted the PBA to engage in activity protected by the First Amendment to advocate for the redress of its members' grievances.

169.    Chief Jordan's retaliatory conduct continued even after Sergeant Bunn's termination. Upon information and belief, Chief Jordan falsely informed Mr. Dike that Sergeant Bunn had taken a jar of marijuana from the evidence room. Upon information and belief, Chief Jordan made this false allegation knowing it was false, and despite the fact that investigators with R&D had previously informed Sergeant Bunn that nobody had accused him of taking anything from the evidence room.

170.    Upon information, Chief Jordan's false accusation that Sergeant Bunn took a jar of marijuana was made in retaliation for Sergeant Bunn's protected speech, his association with the PBA, and the PBA's protected petitioning activity.

### CJ Standards Clears Sergeant Bunn of Wrongdoing

171.    On April 9, 2025, CJ Standards held a hearing to determine whether there was probable cause to find that Sergeant Bunn lacked the "good moral character" required by 12 NCAC 09B .0101(12) to retain his occupational certification.

172.    As part of this determination, CJ standards analyzed several issues, including, but not limited to, whether Sergeant Bunn (1) worked to hide information related to his duties and the potential outcome of the evidence room audit, (2) worked to undermine Chief Jordan and his supervisors, (3) provided untrue statements during BPD's internal affairs investigation, (4) ignored lawful orders of his superiors, (5) took actions "designed to cause discredit to [BPD] and specifically Chief Jordan," (6) was attempting to orchestrate Chief Jordan's termination, (7) deleted files from BPD's servers, (8) destroyed City property, (9) countermanded orders from Chief Jordan, or (10) abused his authority.

173.    CJ Standards reviewed the same facts available to BPD.

174.    During Sergeant Bunn's hearing, his counsel explained that the true reason for Sergeant Bunn's termination was the fact that he spoke with the PBA, the content of his privileged communications with the PBA, and the PBA's advocacy on his behalf. His counsel further explained that Sergeant Bunn never took evidence from the evidence room, and that Sergeant Bunn never intentionally deleted files from his OneDrive.

175.    After hearing Sergeant Bunn's presentation, the CJ Standards panel deliberated for no more than five minutes before correctly rejecting the pretextual reasons for Sergeant Bunn's termination. The panel found no probable cause to believe that Sergeant Bunn that lacked good moral character.

## COUNT I

**(Claims Against Thomas Jordan and Wilson Hooper, in Their Official and Individual Capacities, Pursuant to 42 U.S.C. § 1983 For Violation of Sergeant Bunn's First Amendment Right to Free Speech)**

176.    Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

177.    In August 2024, Sergeant Bunn sought legal advice from his counsel at the PBA regarding his potential obligations and duties to report his concerns about missing evidence at BPD's evidence room. He also informed his counsel that BPD's evidence room was missing evidence and that he was concerned about Chief Jordan's lack of urgency in addressing the issue.

178.    Sergeant Bunn's statements to his counsel pertained to a matter of public interest: evidence missing from BPD's evidence room, and Chief Jordan's lack of urgency in addressing the issue. See, e.g., Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1288 (11th Cir. 2000) (statements about evidence missing from an evidence room "relate to a matter of public concern."); Wallace v. Burnet Cnty., Texas, No. A-08-CA-824-SS, 2009 WL 10699908, at *7

(W.D. Tex. Mar. 27, 2009) (holding that officer spoke as a private citizen on a matter of public concern by reporting missing evidence to a person outside his workplace).

179.    Sergeant Bunn's communications with his counsel did not disrupt any aspect of BPD's operations or its ability to provide efficient public services.

180.    Sergeant Bunn's counsel communicated these concerns, which pertained to a matter of public interest, to City Attorney McKeller.

181.    Sergeant Bunn's counsel's communications with City Attorney McKeller did not disrupt any aspect of BPD's operations or its ability to provide efficient public services. In fact, Sergeant Bunn's counsel's communications were intended to improve BPD's operations and efficiency.

182.    City Attorney McKeller then notified Chief Jordan that Sergeant Bunn had shared concerns about BPD's missing evidence with his counsel.

183.    As a direct and proximate result of Sergeant Bunn's statements to his counsel, and as a direct and proximate result of his counsel's statements to the City Attorney—all of which pertained to a matter of public interest—Sergeant Bunn was locked out of BPD's systems and escorted from the premises by another officer at the request of Chief Jordan.

184.    Furthermore, upon information and belief, as a direct and proximate result of Sergeant Bunn's statements to his counsel, and as a direct and proximate result of his PBA's counsel's statements to the City Attorney, Chief Jordan took steps that Sergeant Bunn and, upon information and belief, Ms. Hinds, reasonably interpreted as indicating that Chief Jordan intended to blame Sergeant Bunn for the missing evidence.

185.    As revealed by Chief Jordan's later pretextual accusations to CJ Standards, Chief Jordan did, upon information and belief, in fact intend to blame Sergeant Bunn for at least some missing evidence.

186.     Sergeant Bunn, acting in his personal capacity, reported Chief Jordan's retaliatory actions and BPD's missing evidence—both matters of public interest—to City Attorney McKeller and Manager Hooper on September 20, 2024.  Sergeant Bunn's communications to City Attorney McKeller and Manager Hooper did not disrupt any aspect of BPD's operations or its ability to provide efficient public services.

187.     The next business day, upon information and belief, as a direct and proximate result of (1) Sergeant Bunn's statements during the September 20, 2024 meeting, (2) Sergeant Bunn's communications with his attorney, and (3) Sergeant Bunn's attorney's communications with City Attorney McKeller, Chief Jordan placed Sergeant Bunn under investigation.

188.     Ultimately, as a direct and proximate result of (1) Sergeant Bunn's statements during the September 20, 2024 meeting, (2) Sergeant Bunn's communications with his attorney, and (3) Sergeant Bunn's attorney's communications with City Attorney McKeller, Chief Jordan terminated Sergeant Bunn, and Manager Hooper affirmed that dismissal based on pretextual reasons.

189.     Chief Jordan and Manager Hooper had final authority over the City's policy with respect to Sergeant Bunn's termination. Those Defendants determined Sergeant Bunn's constitutionally protected conduct was a violation of City policy. The purported enforcement of the City's policy thus deprived Sergeant Bunn of his rights.

190.     Furthermore, upon information and belief, Chief Jordan falsely accused Sergeant Bunn of taking evidence from the evidence room during the investigation by CJ Standards.

191.     As a result of these adverse actions against Sergeant Bunn, taken under the color of state law, Chief Jordan and Manager Hooper violated Sergeant Bunn's right to free speech as guaranteed by the First Amendment of the Constitution of the United States.

192.    As a result of the foregoing conduct, Sergeant Bunn seeks compensatory damages, special damages, and a declaration that the actions of Defendants violated his constitutional rights.

<u>COUNT II</u>

**(Claims Against Thomas Jordan and Wilson Hooper, in Their Official and Individual Capacities, Pursuant to 42 U.S.C. § 1983 For Violation of the PBA's First Amendment Right to Free Speech)**

193.    Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

194.    The PBA is an "advocacy organization[]" comprised of more than 17,000 officers in North Carolina whose purpose is to protect "its members' well-being[,] . . . [and] promot[e] the livelihood of its members[.]" <u>Raymond v. N. Carolina Police Benevolent Ass'n., Inc.</u>, 365 N.C. 94, 100, 721 S.E.2d 923, 927 (2011). The PBA engages in public advocacy on behalf of its members, including Sergeant Bunn.

195.    The PBA took steps to advance this interest here by (1) hiring and assigning counsel to Sergeant Bunn, (2) sending correspondence to Mayor Copelof and the Brevard City Council alerting them to BPD's missing evidence and Chief Jordan's retaliatory conduct and petitioning them to provide redress for their members' grievances, and (3) making public statements during the September 16, 2024, City Council meeting and petitioning the elected members of the Brevard City Council to provide redress for its members' grievances.

196.    Based on the PBA's advocacy efforts and public statements, Chief Jordan and Manager Hooper took adverse action against Sergeant Bunn, whom Chief Jordan and Manager Hooper knew was a PBA member. This adverse action included placing Sergeant Bunn under investigation and ultimately terminating his employment.

197.    By basing Sergeant Bunn's termination on his communications with the PBA and his attorney, and upon the PBA's statements, Chief Jordan and Manager Hooper's

conduct "hinder[ed] [the PBA's] purpose of promoting and protecting the interests of members and individuals." Raymond, 365 N.C. at 100, 721 S.E.2d at 927. Further, Chief Jordan and Manager Hooper's conduct was reasonably calculated to chill communications between the PBA and its members about events at BPD.

198.    Accordingly, Chief Jordan and Manager Hooper's actions, taken under color of state law, violated the PBA's right to free speech as guaranteed by the First Amendment of the Constitution of the United States.

199.    As a result of the foregoing conduct, the PBA seeks  damages, and a declaration that the actions of Chief Jordan and Manager Hooper violated its constitutional rights.

## COUNT III

**(Claims Against Thomas Jordan and Wilson Hooper, in Their Official and Individual Capacities, Pursuant to 42 U.S.C. § 1983 For Violation of PBA's First Amendment Right to Petition the Government)**

200.    Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

201.    The Constitution protects the right to associate as a means of collectively engaging in activities that are entitled to First Amendment protection. Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984). This includes the right to petition the government for the redress of grievances. Id.

202.    The PBA is an association of more than 17,000 law enforcement officers who have associated with one another "in pursuit of a wide variety of political, social, economic . . . ends," Id., including the promotion of its their livelihood by petitioning the government for the redress of their members' grievances. See Raymond, 365 N.C. at 100, 721 S.E.2d at 927.

203.    On September 13, 2024, the PBA, through Mr. Tullis, sent correspondence to the Brevard City Council stating:

We recently received information that the evidence room at the Brevard Police Department is missing evidence, and there are attempts to obstruct the transparency needed to ensure fair and equal protection for all citizens. Officers who have come forward with information are now being targeted for retaliation by the administration of the police department.

We strongly urge the city council to use its authority to investigate matters of the city given to them in Chapter 160A-80 (Power of investigation; subpoena power) of the North Carolina General Statutes. Since the employees of the BPD have lost faith in the fair and impartial administration, we will also request the city to form a personnel board using the authority given in NCGS 160A-165 (Personnel board). As police services are a matter of public concern, we hope you take the inequities seriously and use your authority to investigate the issues.

(Ex. 7).

204.    Mr. Tullis sent this correspondence for the purpose of petitioning the Brevard City Council to provide redress for PBA members' grievances—including grievances held by Sergeant Bunn.

205.    On September 16, 2024, the Brevard City Council met in regular session. During this session, the City Council allowed for public comments.

206.    During public comment, the PBA, through Mr. Tullis and Mr. McGaha, petitioned the City of Brevard to provide redress for its members' grievances—including grievances held by Sergeant Bunn. (Ex. 3).

207.    One week later, Chief Jordan placed Sergeant Bunn, a PBA member, under investigation. Chief Jordan knew Sergeant Bunn was a PBA member.

208.    Upon information and belief, the PBA's September 13, 2024 letter and statements during the September 16, 2024 meeting proximately caused (a) Chief Jordan to place Sergeant Bunn under investigation, (b) Chief Jordan to terminate Sergeant Bunn, and (c) Manager Hooper to affirm Sergeant Bunn's termination for pretextual reasons.

209.    In taking these adverse actions against Sergeant Bunn, under color of state law, based on the PBA's petitioning activities, Chief Jordan and Manager Hooper violated

the PBA's right to petition the government as guaranteed by the First Amendment of the Constitution of the United States.

210.     As a result of the foregoing conduct, the PBA seeks damages, and a declaration that the actions of Chief Jordan and Manager Hooper violated its constitutional rights.

## COUNT IV

**(Claims Against Thomas Jordan and Wilson Hooper, in Their Official and Individual Capacities, Pursuant to 42 U.S.C. § 1983 For Violation of Plaintiffs' First Amendment Right to Free Association)**

211.     Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

212.     Law enforcement officers, including Sergeant Bunn, have the right to "gather together for the lawful purpose of helping and advising one another in asserting the rights Congress gave them." See Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar, 377 U.S. 1, 5 (1964). Sergeant Bunn joined the PBA, an association of his fellow law enforcement officers, for this purpose.

213.     The PBA exists not only to protect "its members' well-being[,] . . . [and] promoting the livelihood of its members[,]" Raymond, 365 N.C. at 100, 721 S.E.2d at 927, but also to "advance[] belief and ideas" and "pursue [the] lawful . . . interests" of its members. See Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S. 449, 460 (1958). The PBA endeavored to do so here.

214.     The PBA has the right to hire attorneys to "assist its members in the assertion of their legal rights." See United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n, 389 U.S. 217, 221-22 (1967). The PBA did so here.

215.     Sergeant Bunn's decision to associate and share concerns with, and seek advice from, an attorney retained for Sergeant Bunn by the PBA—and the PBA itself—proximately

caused Chief Jordan and Manager Hooper to place Sergeant Bunn under investigation and terminate him.

216.    Further, upon information and belief, public statements made by the PBA proximately caused Chief Jordan and Manager Hooper to place Sergeant Bunn under investigation and terminate him. Chief Jordan and Manager Hooper took adverse action against Sergeant Bunn not because he made these statements himself, but because the PBA, with which he was associated, made them.

217.    Neither Sergeant Bunn's association with the PBA, nor the PBA's association with Sergeant Bunn, disrupted any aspect of BPD's ability to provide efficient public services.

218.    By taking adverse action against Sergeant Bunn, under color of state law, based on Sergeant Bunn and the PBA's association with one another, Chief Jordan and Manager Hooper violated the PBA's and Sergeant Bunn's right to free association as guaranteed by the First Amendment of the Constitution of the United States.

219.    As a result of the foregoing conduct, the PBA and Sergeant Bunn seek compensatory damages, and a declaration that the actions of Chief Jordan and Manager Hooper violated their constitutional rights.

## COUNT V

**(Claims Against City of Brevard Pursuant to 42 U.S.C. § 1983 For Violation of Plaintiffs' First Amendment Rights to Free Association, Free Speech, and Petition the Government)**

220.    Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

221.    As City Manager, Manager Hooper "is responsible for carrying out the policies of the city and ordinances adopted by the City Council." Manager Hooper is the "Chief Administrative Officer, [and] is empowered to make all personnel appointments, supervise the work of all city departments, enforce the laws and ordinances of the city, supervise

preparation of the annual operating budget for council approval, and conduct day to day business of the city."

222.    Chief Jordan is the Chief of Police for the City of Brevard. Upon information and belief, in this role, Chief Jordan is responsible for the creation and enforcement of policies and procedures governing personnel decisions at BPD.

223.    Basing their decision on the constitutionally protected conduct of Sergeant Bunn and the PBA as described herein, Chief Jordan and Manager Hooper terminated Sergeant Bunn pursuant to the policies of the City of Brevard and BPD.

224.    The execution of the express policies of the City of Brevard thus inflicted injury on both Sergeant Bunn and the PBA.

225.    As a result of the foregoing conduct, Plaintiffs seek a declaration that the City of Brevard violated their rights under the Constitution of the United States, and for an award of compensatory damages.

## COUNT VI

**(Claims Against All Defendants for Violation of Plaintiffs' Right of Assembly, Petition, and Speech under N.C. Const. Art. 1 §§ 12, 14)**

226.    Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

227.    The North Carolina Constitution provides that the "people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances." N.C. Const. art. I, § 12.

228.    This provision protects the right of Sergeant Bunn and the PBA to "express[ ] [their] views to government officials" and to "influence their actions . . . whether in the legislative, executive, or judicial branch." Cheryl Lloyd Humphrey Inv. Co., LLC v. Resco Prods., Inc., 377 N.C. 384, 384, 388, 858 S.E.2d 795, 797, 799 (2021).

229.    The North Carolina Constitution also provides that "[f]reedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse." N.C. Const. art. I, § 14.

230.    As described above, Defendants violated Plaintiffs' rights under N.C. Const. art. I, §§ 12, 14 by:

- Attempting to scapegoat Sergeant Bunn for missing evidence because of his association and privileged communications with his counsel in August 2024;

- Placing Sergeant Bunn under investigation and on administrative leave because of (1) Sergeant Bunn's statements during the September 20, 2024 meeting, (2) Sergeant Bunn's association and communications with his attorney, (3) Sergeant Bunn's attorney's communications with City Attorney McKeller, and (4) the PBA's September 13, 2024 letter to the Brevard City Council;

- Terminating Sergeant Bunn because of (1) Sergeant Bunn's decision to associate with and seek advice from an attorney; (2) Sergeant Bunn's statements during the September 20, 2024 meeting, (3) Sergeant Bunn's communications with the PBA and his attorney, (4) Sergeant Bunn's attorney's communications with City Attorney McKeller, (5) the PBA's public advocacy for Sergeant Bunn; and

- Making false allegations against Sergeant Bunn to CJ Standards in retaliation for Sergeant Bunn's constitutionally protected conduct;

- Engaging in the other conduct described in the foregoing paragraphs.

231.    As a result of the foregoing conduct, Plaintiffs seek a declaration that Defendants violated their rights under the North Carolina Constitution, and for an award of damages.

232.    Plaintiffs lack another adequate remedy at law for the foregoing violations of the North Carolina Constitution.

**(Claim Against All Defendants for The Wrongful Discharge of Sergeant Bunn)**

233.     Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

234.     Upon information and belief, the City of Brevard has waived sovereign immunity by participating in a local risk financing fund administered by the North Carolina League of Municipalities.

235.     Under North Carolina law,

An employer wrongfully discharges an at-will employee if the termination is done for 'an unlawful reason or purpose that contravenes public policy.' As stated in Amos, the public-policy exception was 'designed to vindicate the rights of employees fired for reasons offensive to the public policy of this State.' This language contemplates a degree of intent or wilfulness on the part of the employer. In order to support a claim for wrongful discharge of an at-will employee, the termination itself must be motivated by an unlawful reason or purpose that is against public policy.

Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 571–72, 515 S.E.2d 438, 441 (1999) (citations omitted).

236.     The North Carolina Constitution and Constitution of the United States protect Sergeant Bunn's right to speak and associate freely.

237.     Further, N.C. Const. art. I, § 1 (the "Fruits of Labor Clause") Clause provides "substantive economic protections" for Sergeant Bunn's right to "'earn [his] daily bread.'" Proctor v. City of Jacksonville, 910 S.E.2d 269, 276 (N.C. Ct. App. 2024) (citations omitted). The Fruits of Labor Clause prohibits the City of Brevard from "punish[ing] [Sergeant Bunn] for standing up to the government." Kinsley v. Ace Speedway Racing, Ltd., 386 N.C. 418, 426, 904 S.E.2d 720, 728 (2024).

238.     Defendants wrongfully terminated Sergeant Bunn in violation of North Carolina's public policy because the termination was based on, upon information and belief,

his speech, association with the PBA, and his decision to "stand[] up to the government" by reporting Chief Jordan's misconduct.

239.    As a result of his wrongful termination, Sergeant Bunn sustained damages.

240.    As a result of the foregoing conduct, Sergeant Bunn seeks compensatory and special damages.

## COUNT VIII

**(In The Alternative to Count VII – Claim Against All Defendants for Violation of Sergeant Bunn's Rights Under N.C. Const. art. I, § 1)**

241.    Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

242.    In the event it is determined that Defendants have not waived sovereign immunity, Sergeant Bunn asserts a claim against Defendants pursuant to N.C. Const. art. I, § 1 (the "Fruits of Labor Clause").

243.    The Fruits of Labor Clause provides that it is "self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." N.C. Const. art. I, § 1.

244.    The Fruits of Labor Clause provides "substantive economic protections" for the right of North Carolinians to "'earn their daily bread.'" Proctor, 910 S.E.2d at 276.

245.    Defendants' decision to terminate Sergeant Bunn was not made to "promote the accomplishment of a public good, or to prevent the infliction of a public harm." State v. Ballance, 229 N.C. 764, 770, 51 S.E.2d 731, 735 (1949). On the contrary, Defendants' terminated Sergeant Bunn to "punish [him] for standing up to the government." Kinsley, 386 N.C. at 426, 904 S.E.2d at 728. This is not a proper government purpose. Id.

246.     As a result of Defendants' actions described herein, taken under color of state law, Sergeant Bunn sustained damages.

247.     If Defendants have not waived sovereign immunity, Sergeant Bunn lacks another remedy under North Carolina law for Defendants' conduct as described herein.

248.     As a result of the foregoing conduct, the Sergeant Bunn seek compensatory damages, special damages and a declaration that the actions of Defendants violated his constitutional rights.

## COUNT IX

**(Claim Against Chief Jordan in his Individual Capacity for Slander *Per Se*)**

249.     Plaintiffs repeat and reallege the allegations of the paragraphs above as if fully set forth herein.

250.     Upon information and belief, Chief Jordan falsely informed CJ Standards' investigator that Sergeant Bunn had taken a jar of marijuana from the evidence room.

251.     Upon information and belief, Chief Jordan made this accusation in bad faith knowing it was false, with a reckless disregard for the truth, and/or with a high degree of awareness of its falsity.

252.     Chief Jordan's accusation—made directly to Sergeant Bunn's occupational licensing entity—tended to prejudice Sergeant Bunn in his reputation, trade, and means of livelihood.

253.     As a result of Chief Jordan's accusation, Sergeant Bunn sustained damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Sergeant Bunn and the PBA respectfully pray:

1.      That the Court find and declare that the actions of Defendants violated Sergeant Bunn's rights as protected by the Constitution of the United States and the North Carolina Constitution;

2.      That the Court find and declare that the actions of Defendants violated the PBA's rights as protected by the Constitution of the United States and the North Carolina Constitution;

3.      That Sergeant Bunn and the PBA be awarded damages, including nominal damages, compensatory damages, and punitive damages as permitted by law;

4.      That the Court grant Plaintiffs a jury trial on all issues so triable;

5.      That the Court award Plaintiffs their reasonable attorneys' fees as allowed by law;

6.      That the Court tax the costs of this action against the Defendants as allowed by law; and

7.      That the Court award such further and additional relief as the Court may deem necessary and proper.

This the April day of 23, 2025.

/s/ Jeffrey S. Warren

Jeffrey S. Warren
N.C. Bar No. 53652
Ellis & Winters LLP
P.O. Box 33550
Raleigh, NC 27636
Telephone: (919) 865-7000
Facsimile: (919) 865-7010
Email: jeff.warren@elliswinters.com

*Attorney for Plaintiff Wilson Bunn*